472 P.2d 19

**The STATE of Arizona, Appellee,**

v.

**Erwin MURRAY, Appellant.**

**No. 2081.**

Supreme Court of Arizona,
In Banc.

July 2, 1970.

Rehearing Denied Sept. 15, 1970.

Law Offices of William C. Scott, by Paul E. Wolf, Tucson, for appellant.

Gary K. Nelson, Atty. Gen., by Carl Waag, Asst. Atty. Gen., for appellee.

UDALL, Justice:

The appellant, defendant below, was charged with the crime of robbery which was alleged to have been committed on the 28th day of January 1969 in Pima County, Arizona.

The case was tried on May 7th and 8th, 1969, and the defendant was found guilty by the jury. From the judgment of conviction and sentence he appeals.

It is alleged by the state that the defendant, Erwin Murray, came to the service station operated at 1001 South 6th Avenue, Tucson, Arizona, at about 2:30 a. m. on January 28, 1969; that one Warren Innis Uselman was the attendant at the service station and that at the point of a gun, he was robbed by the defendant of approximately $96.00.

The only question presented on the appeal has to do with the identification of the defendant. The question, as stated by the defendant, is as follows:

"Did the trial court err in denying defendant's motion to suppress the testimony of Warren Innis Uselman relative to his identification of defendant as the perpetrator of the crime with which the defendant was charged?"

At the beginning of the trial the court conducted a hearing, in the absence of the jury, on the defendant's motion to suppress the evidence on the ground that a proper identification of the defendant, as the alleged perpetrator of the crime, had not been made.

At this hearing the victim testified that shortly after the robbery he went with the police to look at six male Negros in the general neighborhood of the crime. The victim remained in the police car and looked at the six men who were being held in the focus of a spotlight. Five of the number were ruled out by the victim as possible suspects. As to the sixth man, however, the victim stated that he was somewhat like the man who "held me up", but due to the spotlight at that time of the night the victim stated he could not be positive of the identification.

The victim further testified that on the same morning, at about 10:30 A. M., two detectives came over to his house and asked him to look at six photographs of adult male Negros, to see if he could make an identification. He definitely ruled out five of the persons whose pictures were shown to him as not being the person who had robbed him. As to the sixth person he stated: "This looks a lot like him" and "I would like to see him face to face."

Two days later the victim was shown a photograph of the same man, which photograph was one of the six he had previously looked at, and he again stated to the officers that the photograph looked like a picture of the man who had robbed him, and he again expressed a desire to see the man in person. He further testified that on the 3d day of February 1969, which was approximately four days after he had seen the photograph of the person whom he said looked like the "man", he was brought to the police station and permitted to look at a suspect. His testimony of what took place after he was brought where he could observe the suspect in question is as follows:

"Q   Was this man one of a group of men that you looked at?

"A   No, just one man.

"Q   How long did you observe him?

"A   I would say approximately 30 seconds, perhaps more.

"Q   Did anybody indicate to you that that was the man you were supposed to look at?

"A   Yes.

"Q   Who?

"A   Well, let me see, the detectives brought me into the room with him, and I believed I asked to see him walk, too. I don't know that someone said, 'There's the man,' but I recall asking if I could see him walk, and so forth.

"Q   Do you recall whether or not he did walk?

"A   Yes, I believe so.

"Q   Was he asked to say anything?

"A   No.

"Q   What did you say after you had seen that individual?

"A   I'm not sure what my exact words were. It came out in the report not quite right. My feeling was, 'That looks just like the man that robbed me.' "

"Q   Did you say, 'That looks like the man,' or, 'That is the man', or don't you remember?

"A   I am not sure what, exactly, I said.

"Q   When you saw him in person, did you recall ever seeing him before?

"A   Well, yes. I knew that he was the man I had seen that night. I mean when I went in a police car—

"Q   Did you know that when you were looking at his photographs, photographs of him?

"A   I knew it on the 30th of January when just I saw his photograph; the morning after, I don't know.

"Q   You said that you saw this man personally—the night you were robbed. Is that correct?

"A   That is correct.

"Q   And you recalled him?

"A   Yes. Yes.

"Q   You saw his photograph among four, five others that same morning?

"A   Yes.

"Q   Later in the day in the daylight?

"A   Yes.

"Q   You again saw his photograph approximately two days later?

"A   Yes.

"Q   Alone?

"A   Yes.

"Q   And you saw him alone in the police station, is that correct?

"A   That is correct. Yes.

"Q   When you finally saw him at the police station is that when you indicated to the police that is the man who robbed you?

*      *      *      *      *      *

"A   I believe my reaction to this was something to the effect I can't recall my exact words, but as I recall I didn't say I am one hundred percent positive that's the man. I believe I said it wasn't definitely, 'That's the

the man. He looks something like the man.'"

"Q Perhaps we can qualify this: Is this the first time—strike that. Is this the first time when you saw him in the police station when you were more sure than you had been before?

"A Yes, sir, it is."

At the hearing on the motion to suppress, Detective Ronald E. Penning testified that in connection with his investigation of the robbery of the station he procured the names of the persons who had been stopped by the police shortly after the robbery took place, and found out that Erwin Murray, the defendant, was the one of the six whom the victim had stated looked like the man who had robbed him. He stated that he procured from the files in the police office the photographs of the men who had been detained and had been seen by the victim, and that he took these photographs to the home of the victim about 10:30 in the morning, at which time he showed the photographs to the victim. He stated further that after the victim had looked through the photographs he picked out the picture of Murray as the person who appeared to be the one who had robbed him. However, he expressed a desire to see the defendant face to face. The officer testified that on Friday evening he met the defendant who said he would like to be looked at by the victim, and the defendant expressed a desire to come to the police office and have a face to face meeting with the victim. It was thereupon agreed that the defendant Murray and the victim Uselman would meet at the office of the detective division, the defendant stating that he would like to be looked at by this individual and stating that, "I want to see him, too, as much as he wants to see me, to get this situation straightened out." When the two met at the detectives' office it was not a police lineup but a meeting in response to a desire on the part of each of them to have a face to face meeting.

The testimony of the victim, in reference to his meeting with the defendant, is recorded as follows:

"Q [With] what degree of positiveness can you tell us at this point with respect to your identification of the defendant who you have identified after having seen him face to face in the Detective Division?

"A Again you are asking me to answer on scale—

"Q If you can.

"A On one hundred point scale I would say ninety-eight.

"Q Any qualifications that you would have?

"A Only that, for example, if the man had, say, a twin, identical twin, then in a situation like that I could be mistaken.

\*       \*       \*       \*       \*       \*

"Q When was it that you formed an image in your mind of what the defendant looked like to allow you to identify him in the courtroom?

"A I think when I really got the best look at him was when he just walked in the door, immediately walked in the door and turned around and looked at me.

"Q What I am talking about—

"A During the robbery was the best time I got the best look was when he was just standing at the door and I stood up."

At the conclusion of the hearing on the "Motion to Suppress the Evidence", the court made the following order:

"The record may show that the Motion to Suppress is denied."

Immediately thereafter the trial of the case began, at which time the testimony of the victim and the officers were substantially the same as the testimony given at the hearing to suppress. The victim did, in open court, identify the defendant as the person who had robbed him at the service

station located at 1001 South 6th Avenue, at about 2:30 A.M. on the morning of January 28, 1969.

The record further shows that when the defendant was first contacted by Detective Penning he was fully advised of his constitutional rights and that the usual procedure of reading the Miranda warnings from a card prepared for that purpose was followed by the officer before talking to the defendant about the case.

As a defense to the state's case, defendant took the stand in his own behalf and testified that he was not in the general area at the time the crime was committed and that he and another person were together at a place or places quite some distance from where the service station is located.

Thereafter, the matter was submitted to the jury for its consideration—after they had been fully instructed as to the law applicable in the case. The jury brought in a verdict of "guilty" as charged in the information.

█ The defendant on appeal first contends that the pre-trial identification procedures, which resulted in the identification of the defendant as the perpetrator of the robbery, were unduly suggestive and that the evidence and testimony relating to the identification should have been suppressed. Secondly, the defendant alleges that the "in court" identification of the defendant, as the perpetrator of the robbery, was irreparably tainted by the pre-trial identification procedures, so as to render the "in court" identification illegal. Both contentions are without merit. They are so closely related that they will be considered together.

█ It is now established that questions as to whether there has been an accurate in-court identification of the defendant, untainted by prior identification procedures, and whether procedures followed were fair to the defendant are preliminary questions for the trial court. State v. Dessureault, 104 Ariz. 380, 453 P.2d 951 (1969), cert. denied 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.

2d 257; State v. Darby, 105 Ariz. 115, 460 P.2d 9 (1969). See also United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 2d 1149 (1967). The trial court's determination will not be disturbed on appeal unless there is clear and manifest error. State v. Darby, supra.

The state points out that the victim, very shortly after the robbery, after looking at five or six male Negros, under rather poor lighting conditions, picked out one of the six as being "a person who looked like the man who held me up." This person so picked later proved to be the defendant. Later in the morning, at approximately 10:30 a. m., the victim again, after looking over six photographs of adult male Negros, picked out the defendant and stated: "This looks a lot like him." Two days later he was shown a photograph of the same individual and he stated that the photograph looked like a picture of the man who robbed him; and some three or four days later, at a face to face meeting with the defendant, he made what he described as a 98% accurate identification. In each instance the victim made the identification himself. The officers did not suggest or in any way prompt him to make the identification.

In State v. Dessureault, supra, 104 Ariz. at 383–384, 453 P.2d at 954, a case where a similar question of law was involved, we stated:

"First, where, as here the in-court identification is challenged at the trial level, meaningful review requires that the appellate court reach one of the following conclusions: if it can be determined from the record on clear and convincing evidence that the in-court identification was not tainted by the prior identification procedures or from evidence beyond a reasonable doubt that it was harmless, and there is otherwise no error, the conviction will be affirmed. If it can be determined from the record that the in-court identification was tainted and that it does not appear harmless beyond a reasonable doubt, the conviction will be reversed."

In the instant case, the victim did not at any of the identification procedures fail to point to the defendant as the person who "looked like the man who robbed me", and his final conclusion, that he believed he could say he was 98% sure was made after being most cautious in his testimony. The witness concluded that he could have been mistaken only if the defendant had an identical twin.

 The question of the identity of the defendant was a question of fact that was properly submitted to the jury which resolved it in favor of the state.

The judgment is affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and McFARLAND and HAYS, JJ., concur.